IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| FATBOY USA, LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> PIETER SCHAT, SCHAT IMPORT ) <br> AGENCIES, INC., and SITTING BULL, ) <br> GMBH, ) <br> ) <br> Defendants. ) | **MEMORANDUM OPINION** <br> **AND RECOMMENDATION** <br> <br> 1:07CV965 |

This matter comes before the court on Defendant Sitting Bull, GmbH's motion to dismiss for lack of personal jurisdiction (docket no. 14) pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.[1] Plaintiff has responded in opposition to Defendant's motion (docket no. 29), and the motion is thus ripe for disposition. The parties have not consented to the jurisdiction of a magistrate judge; therefore, the court must deal with Defendant's motion by way of recommendation. For the following reasons, it will be recommended that the court deny Defendant's motion to dismiss.

---

[1] Defendant's original motion also sought to dismiss for lack of proper service pursuant to Rule 12(b)(5). That issue, however, has been resolved by stipulation (docket no. 25).

**PROCEDURAL POSTURE**

On December 21, 2007, Plaintiff, Fatboy USA, LLC filed this action against Defendants Pieter Schat, Schat Import Agencies, Inc., and Sitting Bull, GmbH asserting claims for unfair and deceptive trade practices pursuant to N.C. GEN. STAT. § 75-1.1, violation of the North Carolina Trade Secrets Protection Act, N.C. GEN. STAT. § 66-152, tortious interference with contract, and violation of the Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030. (Compl. ¶ 1.) Defendants Pieter Schat and Schat Import Agencies timely answered the complaint (docket no. 7). Defendant Sitting Bull, however, failed to respond. As a result, Plaintiff moved for entry of default against Defendant Sitting Bull (docket no. 11), and on February 25, 2008, the court granted Plaintiff's motion for entry of default against Defendant Sitting Bull (docket no. 12). The entry of default was subsequently vacated pursuant to a stipulation among the parties. (*See* docket no. 25.)

On April 3, 2008, Defendant Sitting Bull filed a motion to dismiss pursuant to Rules 12(b)(2) and (5) of the Federal Rules of Civil Procedure, contending that service of process was inadequate and that the court lacked personal jurisdiction over Sitting Bull (docket no. 14). After entertaining several motions regarding jurisdictional discovery, the court entered a stipulation and order dismissing Defendant Sitting Bull's motion to dismiss based on inadequate service (docket no. 25). This recommendation and opinion addresses Defendant Sitting Bull's remaining motion to dismiss based on lack of personal jurisdiction.

**FACTS**

The following facts are taken in the light most favorable to Plaintiff on Defendant's motion to dismiss for lack of personal jurisdiction. Plaintiff Fatboy USA, LLC (hereinafter "Fatboy" or "Plaintiff") is a limited liability company registered to conduct business in North Carolina with its principal place of business in Coppell, Texas. (Compl. ¶ 5.) Defendant Pieter Schat is a citizen and resident of Toronto, Ontario, Canada and regularly conducts business in North Carolina. (*Id.* ¶ 6.) Defendant Schat Import Agencies, Inc. (hereinafter "Schat Import") is a corporation organized under the laws of Ontario, Canada that maintains and conducts business from a distribution facility in High Point, North Carolina. (*Id.* ¶ 7.) Defendant Sitting Bull, GmbH (hereinafter "Sitting Bull" or "Defendant") is a German corporation that distributes its products through Bull Designs, a North Carolina limited liability company based in High Point, North Carolina. (*Id.* ¶ 8.)

**A.    Formation of the Relationships between the Parties**

Plaintiff Fatboy is a designer and manufacturer of designer beanbags and related products. (*Id.* ¶ 9.) As part of its business operations, Fatboy maintains a computer list of more than 400 customers, as well as confidential pricing information regarding its customers and suppliers. (*Id.* ¶ 11.) Fatboy contends that such information is confidential and, as such, is a trade secret. (*Id.* ¶¶ 11-14.) Defendants Pieter Schat and Schat Import distributed Fatboy's products from their High Point, North Carolina facility from May 2005 to June 2007. (*Id.* ¶ 15.) In June

3

2007, Fatboy terminated its relationship with Pieter Schat and Schat Imports and moved its operations to Texas.  (*Id.* ¶ 10.)

Bull Designs currently operates out of a warehouse in High Point, North Carolina owned by Schat Import.  (Chiriac Dep. at 32.)  It does not, however, pay Schat Import any rent for its use of the warehouse.  (*Id.* at 33.)  The warehouse is the same warehouse where Schat Import conducted distribution activities related to Fatboy's products.  (Schat Dep. at 9.)  Bull Designs' sole activity since its inception is marketing and distributing Sitting Bull's products. (Flöetotto Dep. at 11.)

    **B.**    **Nature of the Distribution Agreement between Sitting Bull and Bull Designs**

In July 2007, Bull Designs entered into an agreement with Sitting Bull to act as Sitting Bull's exclusive distributor in the United States, Mexico, and Canada.[2]  (*Id.* at 20.)  The distribution agreement between Bull Designs and Sitting Bull arose out of a meeting in April 2007 between Bull Designs' principals, Pieter Schat and Cornell Chiriac, and Sitting Bull's principals, Elmar and Frederik Flöetotto.  (*Id.* at 13.)  According to Frederik Floëtotto, Pieter Schat's knowledge of the American furniture market was the "most important reason" for the selection of Bull Designs as the distributor.  (*Id.* at 25.)  The nature of the agreement between Bull Designs and Sitting Bull involves extensive ongoing collaboration between the two entities.

---

[2] When Defendant Sitting Bull executed the distribution agreement, its name was Brands GmbH.  After signing the distribution agreement with Bull Designs, Brands GmbH changed its name to Sitting Bull, GmbH.

4

The agreement obligates Bull Designs to distribute, partially manufacture, and promote Sitting Bull brand products. This action arises from Bull Designs' contractual obligation to expand Sitting Bull's customer base.

Pursuant to the distribution agreement, Bull Designs is responsible for distribution of all of Sitting Bull's products in North America. (*Id.* at 24.) Product components are shipped from Germany to Bull Designs' address in High Point, North Carolina, where Bull Designs is responsible for completion of manufacture. (*Id.* at 32-34.) Thus, in essence, Sitting Bull relies on Bull Designs to set quality control standards over its finished product.

The terms of the distribution agreement obligate Bull Designs to actively market Sitting Bull products in North America, grow its market, and increase brand recognition. (Distribution Agreement, Pl.'s Ex. D, ¶¶ 2, 6.1, and 8.1.) To further those ends, Bull Designs is licensed to use Sitting Bull's trademark on all of its promotional material. (Floëtotto Dep. at 47.) Moreover, in the past, Bull Designs has distributed promotional material printed in Germany by Sitting Bull at trade shows in North Carolina. (Chiriac Dep. at 88-89.) Bull Designs also maintains a website, approved by Sitting Bull, to promote Sitting Bull products. (*See* Floëtotto Dep. at 40.) Sitting Bull explicitly authorized Bull Designs to use www.SittingBullUSA.com as the website's domain name. (*Id.*) In addition, the Sitting Bull trademark that was licensed to Bull Designs as part of the distribution agreement appears on almost every page of the website. (*Id.* at 59.) Furthermore,

the company history that appears on the website describes the history of Sitting Bull in Germany, not Bull Designs in North Carolina. (*Id.*) The contact page of the website, however, includes a North Carolina phone number and Bull Designs' address in High Point, North Carolina. (*Id.*) In general, Bull Designs' promotional activities, explicitly endorsed by Sitting Bull, intentionally create an impression that Bull Designs, located in High Point, North Carolina, is the U.S. counterpart of the Sitting Bull company based in Germany.

In addition to Bull Designs' contractual obligation to aggressively market Sitting Bull's products, the distribution agreement also imposes strict reporting requirements on Bull Designs. (*See* Distribution Agreement ¶¶ 6.1 & 6.2.) The agreement requires Bull Designs to send a yearly memorandum containing a list of the businesses served during the preceding year, as well as an update every six months listing the fifty best customers and detailing the customers' commercial importance. (*Id.*)

Fatboy contends that around the time it terminated its relationship with Pieter Schat and Schat Import, Pieter Schat improperly accessed Fatboy's computer, acquired Fatboy's customer and pricing information, and disclosed the information to Sitting Bull. (Compl. ¶¶ 15-20.) Furthermore, Fatboy contends that Schat subsequently used the information to market Sitting Bull products pursuant to Bull Designs' contract with Sitting Bull. *Id.* The following discussion is limited to Defendant Sitting Bull's jurisdictional challenge.

6

**DISCUSSION**

When a court's exercise of personal jurisdiction is challenged pursuant to a Rule 12(b)(2) motion, the plaintiff must prove the existence of a ground for jurisdiction by a preponderance of the evidence. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). If jurisdiction turns on disputed facts, the court may conduct an evidentiary hearing, or postpone ruling on the motion pending receipt of evidence relating to jurisdiction at trial. *Id.* If the court, as here, considers the jurisdictional challenge based solely on motion papers, supporting legal memoranda, and pleadings, the plaintiff need only make a prima facie showing of a sufficient jurisdictional basis. *Id.* When considering a jurisdictional challenge based on the record, the court must construe allegations contained in the pleadings in the light most favorable to the plaintiff, assume credibility, and the most favorable inferences stemming from the evidence must be drawn in favor of the existence of jurisdiction. *Id.*

To determine whether personal jurisdiction is proper, the court must engage in a two-part inquiry. *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993). First, the court must determine whether the state's long-arm statute authorizes the exercise of jurisdiction under the circumstances. *Id.* Second, if the court finds such authorization, it must consider whether the exercise of jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id.* Courts have construed North Carolina's long-arm statute "to

extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause." *Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001) (citing *Century Data Sys., Inc. v. McDonald*, 109 N.C. App. 425, 427, 428 S.E.2d 190, 191 (1993)). Thus, the two inquiries collapse into one. *Ellicott Mach. Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 477 (4th Cir. 1993).

To decide whether the exercise of personal jurisdiction over Sitting Bull comports with due process, therefore, the court must consider whether the defendant has "minimum contacts" with the forum state "such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe v. Wash.*, 326 U.S. 310, 316 (1945). When examining the sufficiency of a non-resident defendant's contacts, "[t]he touchstone of the minimum contacts analysis remains that an out-of-state person have engaged in some activity purposefully directed toward the forum state." *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 945 (4th Cir. 1994). In short, jurisdiction is proper when a relationship exists between the defendant and the forum "such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980).

Personal jurisdiction may be exercised either specifically or generally. *Slaughter v. Life Connection of Ohio*, 907 F. Supp. 929, 933 (M.D.N.C. 1995). Specific jurisdiction is established where the forum state asserts personal

8

jurisdiction over a defendant in a suit "arising out of or related to" that defendant's contacts with the state. *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). By contrast, exercise of general jurisdiction requires the defendant to have "continuous and systematic" contacts with the forum state. *Helicopteros Nacionales de Colombia*, 466 U.S. at 414 n.8. The contacts required for specific jurisdiction are not as extensive as those required for general jurisdiction. *See First Am. First, Inc. v. Nat'l. Ass'n of Bank Women*, 802 F.2d 1511, 1516 (4th Cir. 1986).

The gravamen of Fatboy's complaint is that Pieter Schat misappropriated its trade secrets for the benefit and at the behest of Sitting Bull. (*See* Compl. ¶¶ 1-22.) Fatboy contends that these trade secrets are being used to aid Bull Designs in performing a central purpose of the distribution agreement–namely, marketing Sitting Bull's products and expanding its customer base. (*See id.* ¶¶ 20-21.) In short, Fatboy contends that the distribution agreement between Sitting Bull and Bull Designs was the means by which Fatboy's trade secrets could be exploited by both Sitting Bull and Pieter Schat. (*See id.*) Thus, Sitting Bull's contacts with North Carolina are related to Fatboy's claims. Here, because Plaintiff's cause of action arises out of and is related to Sitting Bull's contacts with North Carolina, an analysis based on specific jurisdiction is proper.

Defendant Sitting Bull claims that because it does not directly conduct business out of North Carolina, has no employees within the state, its

representatives have not traveled to the state, and it does not own any property within the state, it lacks sufficient contacts with North Carolina to support the court's exercise of jurisdiction.³ (Def.'s Br. in Supp. of Mot. to Dismiss at 10.) Sitting Bull does concede that it has a contractual relationship with Bull Designs, a North Carolina company. (Floëtotto Decl. ¶ 7.) It contends, however, that the single contract is inadequate to meet the "purposeful availment" standard. (Def.'s Br. in Supp. of Mot. to Dismiss at 10.)

Nevertheless, even a single contract may give rise to jurisdiction when it amounts to purposeful activity directed toward the forum state. *See McGee v. Int'l Life*, 355 U.S. 220, 223 (1957). Moreover, "marketing [a] product through a distributor who has agreed to serve as the sales agent in the forum [s]tate" indicates purposeful activity directed toward the forum state. *Lesnick*, 35 F.3d at 945 (citing *Asahi-Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 112 (1987)). In assessing whether the court may assert specific jurisdiction over Sitting Bull, the court must examine the extent to which Sitting Bull purposefully directed its activities towards North Carolina, and whether the claims arise out of Sitting Bull's activities purposefully directed at North Carolina. *See Lesnick*, 35 F.3d at 945-46. As part of this analysis, courts have considered various factors, such as

---

³ Defendant also points to a forum selection clause in the distribution agreement designating Germany as the forum in the event of a dispute between the parties. Since, however, Plaintiff was not a party to this agreement, the court does not consider this factor in its personal jurisdiction analysis.

10

who initiated the contact between the parties; whether the contract was to be performed in the forum state; and whether the agreement between the parties contemplated a single transaction or an ongoing relationship. The court will begin its analysis by addressing the circumstances that culminated in the execution of the distribution agreement.

The Fourth Circuit has given great weight to the question of who initiated the contact between the parties. If the defendant initiated the contact, then the courts are more likely to assert personal jurisdiction over the defendant. *See Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 451 (4th Cir. 2000) (finding no personal jurisdiction where the plaintiffs initiated the contractual relationship); *see also CBP Res., Inc. v. Ingredient Res. Co.*, 954 F. Supp. 1106, 1109 (M.D.N.C. 1996) (asserting personal jurisdiction where the defendant initiated the contact with the plaintiff, where the defendant entered into an exclusive distributorship agreement with the plaintiff, and where the defendant was responsible for shipping the products out of the forum). The parties do not dispute the facts surrounding the meeting in April 2007 that resulted in the distribution agreement between Sitting Bull and Bull Designs. Pursuant to a pre-existing relationship between Elmar Flöetotto and Pieter Schat, Bull Designs' principal, Pieter Schat, and Sitting Bull's principals, Elmar and Frederik Flöetotto, discussed the possibility of marketing Sitting Bull's products in the United States. (Flöetotto Dep. at 13.) Because the initial contact between Sitting Bull and Bull

Designs arose out of a pre-existing relationship between Pieter Schat and Elmar Flöetotto, it cannot be said that Sitting Bull initiated the instant relationship. Thus, this factor appears to be in equipoise in the personal jurisdiction analysis.

Another factor courts consider in the personal jurisdiction analysis is whether the parties contemplated that the contract would be performed in the forum state. Where performance under a contract was intended to be performed outside of the forum in question, courts have been reluctant to assert personal jurisdiction over non-resident defendants. *See, e.g., Diamond Healthcare of Ohio, Inc.*, 229 F.3d at 452 (finding no personal jurisdiction over the defendant where the contract called for performance mainly outside of the forum). Here, the plain language of the distribution agreement does not mandate performance in North Carolina. (*See generally* Distribution Agreement.) The circumstances surrounding the distribution agreement, however, suggest that the parties contemplated that it would be performed largely within North Carolina. Bull Designs operates out of a warehouse in High Point, North Carolina, a city of well-known significance to the American furniture market. (*See* Chiriac Dep. at 32.) Indeed, Sitting Bull's principal, Frederik Flöetotto, stated that one of the reasons for choosing Bull Designs to distribute Sitting Bull's products was Pieter Schat's knowledge of the American furniture market. (Flöetotto Dep. at 25.) To be sure Sitting Bull was aware that Bull Designs would capitalize on its presence in High Point, and that much of its promotional activity would be performed there. Furthermore, during their depositions,

12

Defendants acknowledged that Sitting Bull was specifically aware of, and, in fact, endorsed Bull Designs' promotional activities at a trade show in North Carolina.[4] (Chiriac Dep. at 81.) The fact that the circumstances surrounding the distribution agreement suggest that the parties contemplated that the agreement would be performed in North Carolina, and that the agreement was, indeed, performed in North Carolina weighs in favor of asserting jurisdiction over Sitting Bull.

Another factor to be considered in the personal jurisdiction analysis is whether the agreement between the parties contemplated a single transaction or an ongoing relationship. The finding of an ongoing relationship, as opposed to a single transaction, weighs towards assertion of personal jurisdiction. *See, e.g., Chung v. NANA Dev. Corp.*, 783 F.2d 1124, 1127-28 (4th Cir. 1986) (distinguishing between a single transaction in the forum state and a "substantial and continuing relationship") (citing *Burger King v. Rudzewicz*, 471 U.S. 462, 487 (1985)); *CBP Res., Inc.*, 954 F. Supp. at 1109 (finding sufficient contacts where the defendant entered into a five-year agreement with the North Carolina plaintiff). Here, the plain language of the distribution agreement expressly contemplates an ongoing relationship. (Distribution Agreement ¶ 15.) The terms of the distribution agreement mandate a three and one-half year relationship that automatically renews at the end

---

[4] Representatives from Bull Designs attended a furniture trade show in High Point, North Carolina, where they passed out brochures printed by Sitting Bull in Germany. (Chiriac Dep. at 89.) Furthermore, for purposes of brand recognition, and with Sitting Bull's permission, they called themselves Sitting Bull USA and used the Sitting Bull trademark. (*Id.* at 100.)

13

of each additional year. (*Id.*)  Furthermore, the distribution agreement requires close collaboration between Bull Designs and Sitting Bull with respect to Bull Designs' promotional duties. (*See generally* Distribution Agreement.)  Thus, it is fair to say that the distribution agreement represents a "substantial and continuing" relationship between the parties rather than a single transaction.  Therefore, this factor weighs in favor of asserting personal jurisdiction over Sitting Bull.

Moreover, the court notes that other factors weigh in favor of finding personal jurisdiction, starting with Sitting Bull's reason for entering into the distribution agreement with Bull Designs.  As noted, Sitting Bull sought to benefit from Pieter Schat's knowledge of the American furniture market, and when they executed the distribution agreement, Sitting Bull's principals surely were aware that Schat's knowledge stemmed from his operation of a distribution facility in High Point, North Carolina.  (*See* Flöetotto Dep. at 25.)  In addition, Sitting Bull went to great lengths to forge a very visible relationship with Bull Designs.  When Sitting Bull signed the distribution agreement with Bull Designs, Sitting Bull was called Brands GmbH. After signing the distribution agreement, however, Sitting Bull changed its name to Sitting Bull, GmbH.  (*Id.* at 9.)  Furthermore, to increase brand recognition, Sitting Bull licensed Bull Designs to use its exclusive trademark on all of Bull Designs' promotional materials.  (*Id.* at 47.)   Moreover, Bull Designs actually had a hand in manufacturing Sitting Bull's finished product.  (*Id.* at 32-34.)  It appears that Sitting Bull combined forces with Bull Designs to manufacture, distribute, and promote its

14

products. *See Cree, Inc. v. Bridgelux, Inc.*, No. 1:06cv761, 2007 WL 3010532, at *5 (M.D.N.C. July 5, 2007) (noting that a defendant has made "intentional contact with the state" when "the defendant has a hand in the distribution" of its product).

Indeed, Sitting Bull cannot claim that its contacts with North Carolina are "random, isolated, or fortuitous," *see Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984), nor can it claim that they are the product of "unilateral activity" on the part of Bull Designs, *see Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Rather, it appears that Sitting Bull made a concerted effort to reap the benefits of associating itself with a company conducting business in North Carolina. *Cf. B.E.E. Int'l v. Hawes*, 267 F. Supp. 2d 477, 483 (M.D.N.C. 2003) (finding no personal jurisdiction over the plaintiff where commonality between the plaintiff and defendant was the "unilateral activity" of the plaintiff). After carefully considering all of the above factors, the court concludes that Sitting Bull has sufficient minimum contacts with North Carolina for this court to assert jurisdiction over Sitting Bull.

Even though Sitting Bull has sufficient contacts with North Carolina to support jurisdiction, such exercise must also be consistent with "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316. In making this determination, courts consider the burden on the defendant, the interests of the forum state, the efficient resolution of controversies, and the shared interests of the several states in furthering substantive social policies. *Lesnick*, 35 F.3d at 945-46. Fatboy's claims primarily involve unfair business practices allegedly conducted

15

within North Carolina. Although traveling to the United States to defend this lawsuit imposes some burden on Sitting Bull, "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome." *World-Wide Volkswagen Corp.*, 444 U.S. at 294. Furthermore, North Carolina has a substantial interest in discouraging unfair business practices within its borders. Moreover, North Carolina is the only forum where Fatboy may bring suit against all Defendants in one action. Requiring Fatboy to travel to Germany to bring suit against Sitting Bull while also maintaining a suit against the other named Defendants in North Carolina would be highly burdensome and inefficient. Therefore, the court finds that the exercise of jurisdiction in this case would comport with all the requirements of due process and that such exercise of personal jurisdiction is also consistent with the requirements of "fair play and substantial justice."

**CONCLUSION**

For the reasons stated herein, it is **RECOMMENDED** that the district court **DENY** Defendant Sitting Bull, GmbH's motion to dismiss for lack of personal jurisdiction (docket no. 14).

_____
WALLACE W. DIXON
United States Magistrate Judge

November 6, 2009